SCHAEFFER, RESPONDENT, v. MUTUAL BENEFIT LIFE INSURANCE CO., APPELLANT.

(No. 2,613.)

(Submitted February 20, 1909.   Decided March 6, 1909.)

[100 Pac. 225.]

*Principal and Agent—Sale of Real Estate—Special Agent— Unauthorized Act—Liability of Principal.*

Principal and Agent—Authority of Agent—Sale of Land.
 1.   The authority of an agent to sell land must be in writing.
Same—Dealing with Special Agent.
 2.   A person dealing with a special agent is bound at his peril to ascertain the scope of the agent's authority.
Same—Sale of Real Estate—Special Agent—Unauthorized Act—Receipt of Partial Payment—Liability of Principal.
 3.   Plaintiff entered into negotiations with defendant company, through its agent, for the purchase of real estate.   The latter had no general authority to sell the premises, but had to submit every proposition to his principal before acting upon it.   This the plaintiff knew.   Before a contract had been actually entered into, plaintiff paid to the agent $5,000 as part of the purchase price.   After such payment the deal was declared off by defendant company, the parties having been unable to agree upon the terms of sale.   All but $1,000 was returned by the agent to plaintiff, who brought suit against the company to recover that sum.   *Held,* that, the agent having been a special one, plaintiff was bound at his peril to ascertain the former's authority, that the agent exceeded his authority in accepting the partial payment, that his receipt of the sum mentioned was not the receipt by his principal, and that plaintiff could not recover from the latter.

*Appeal from District Court, Lewis and Clark County; J. M. Clements, Judge.*

ACTION by Lincoln H. Schaeffer against the Mutual Benefit Life Insurance Company.   From a judgment for plaintiff, and

from an order denying a new trial, defendant appeals. Reversed.

*Messrs. Gunn & Rasch,* for Appellant.

*Mr. Edward Horsky,* and *Messrs. Walsh & Nolan,* for Respondent.

Where an agent is employed for the sale of property, a contract between him and an intended buyer for the payment of a commission by the latter to the former, in case of a sale, is illegal on account of its tendency to cause the agent to violate his duty to the seller. (15 Am. & Eng. Ency. of Law, 2d ed., 947.) When an agent acts for both parties in making a contract requiring the exercise of discretion, the contract is voidable in equity upon the application of either party, or the circumstance is available as a defense in an action at law upon the contract, and the agent is not entitled to commission for his services. (1 Am. & Eng. Ency. of Law, 1073, 1074; *Rice* v. *Wood,* 113 Mass. 133, 18 Am. Rep. 459; *Ranney* v. *Donovan,* 78 Mich. 318, 44 N. W. 276.) An authority to make a contract for the sale of lands will authorize the agent to receive so much of the proceeds of the money as is to be paid in hand on the sale, as an incident of the sale. (*Alexander* v. *Jones,* 64 Iowa, 207, 19 N. W. 913.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This action was brought to recover the sum of $1,000 and interest. The complaint alleges that about June 1, 1905, plaintiff and defendant entered into a contract by which plaintiff agreed to purchase from defendant, and defendant agreed to sell to plaintiff, the Denver Block in Helena; that, pursuant to said agreement, plaintiff paid to the defendant $5,000 on the purchase price, and collected certain rents from the property; that thereafter, about June 20, 1905, by mutual consent, the contract was rescinded, and each party thereto agreed to return to the

other whatever of value he had received under the contract; that plaintiff returned to defendant the rents collected by him, but defendant did not return the $5,000 or any part thereof, except the sum of $4,000, and refuses to return the remaining $1,000. The answer admits the corporate existence of defendant company, and denies each and every other allegation of the complaint. The plaintiff recovered judgment, and defendant appeals from the judgment and an order denying it a new trial.

The insurance company owned the Denver Block in Helena, and T. B. Miller was its agent for the purpose of renting the building and collecting the rents. The plaintiff, being desirous of purchasing the property, interviewed Miller, who on May 6, 1905, wrote to the company inquiring the price for, and the terms upon which, the property would be sold. The answer of the company indicated that it would want about $40,000 for the property. This was not satisfactory to Schaeffer, and at Miller's suggestion Schaeffer made an offer for the property, and on May 17 Miller assumed to transmit this offer to the company in a letter in which he says: "He [Schaeffer] will purchase the Denver Block, paying therefor $30,000 on the following terms: $5,000 cash, $2,500 in two years, $2,500 in four years, and $20,000 in ten years, interest on deferred payments to be at the rate of four per cent. Deed to be given when $10,000 has been paid on the property and contract for deed given prior to that time. He will pay the taxes for this year and in the future. He would want you to allow the insurance in force at the time of purchase to remain without any expense to him." In reply to this, the vice-president of the company on May 24 wrote: "Our directors are willing to accept an offer of $30,000 for the property, but not on the terms proposed." On May 31 Miller telegraphed the company what purports to be a second offer by Schaeffer for the property, as follows: "Party offers thirty thousand Denver Block, five thousand cash, one thousand each year for five years, balance in ten years, deferred payments five per cent. Shall I accept? Answer." On June 1 the company answered: "You may sell Denver Block for thirty thousand; five thousand cash, balance secured by bond

and mortgage payable one thousand each year for five years, and twenty thousand in ten years with interest at five per cent.'' Upon receipt of this telegram by Miller, Schaeffer paid over to Miller $5,000, and on the same day Miller telegraphed the company as follows: ''Have sold Denver Block as per terms your telegram this date. Interest payable annually. Have collected first payment five thousand.'' The company then wrote Miller, suggesting that it preferred to have the interest made payable semi-annually. On June 5 Miller again telegraphed the company: ''Is proposition five per cent *annual* interest deferred payments Denver Block acceptable, if not purchaser requests return of first payment? Answer.'' And to this the company replied on June 6: ''Deferred payments Denver Block may be five per cent payable annually.'' On June 6 Miller wrote to the company at length, referring to the letters and telegrams which had passed, and, among other things, said: ''The understanding with Mr. Schaeffer for the purchase of the Denver Block is as follows: He is to make payments as above indicated, is to have the rents from June 1 and pay all bills from June 1, you to continue the insurance in force without cost to him, that is now on the building, until date of expiration.'' In reply to this, the company on June 12 said: ''You refer to the insurance now on the buildings. We declined to accept the proposition that the purchaser shall have the insurance to the date of expiration of the existing policies without cost to him. It will be necessary for him to pay for the unexpired term of the policies, in accordance with the universal custom. We give below the amount of premiums to be collected.'' The amount was $320. On June 18 Miller again telegraphed the company: ''Schaeffer will not pay unearned premium on insurance and will only have insurance enough made payable to you to protect amount due you at all times on mortgage. Shall I close sale on those conditions or call trade off? Wire answer.'' And to this the company replied on June 19: ''Call trade of Denver Block off. Return money to Schaeffer.'' On June 19 Miller telegraphed the company: ''Denver Block deal off. Have

returned Schaeffer his money.'' The foregoing correspondence was introduced in evidence by the plaintiff.

The plaintiff testified in his own behalf, and, speaking of his first interview with Miller, says that when he made inquiry of Miller, and Miller told him the company would want about $40,000 for the block, he replied: ''That is too much''; that Miller then said: ''Probably we can get a better price.   *   *   * Step in in a few days. I will write to the company and see what I can do.'' Speaking of his first offer for the property, the plaintiff says that, ''when Miller had received a reply to his letter of inquiry, Miller then said: 'You make me an offer. They will take $30,000. They want $10,000 down.' I said: 'I cannot think of paying $10,000 down. I will pay $5,000 cash and $1,000 a year for five years.' The interest agreed upon was five per cent. That was all very well and good, and he submitted it to the company, and they accepted the terms. The insurance that was on the building was to remain as it was without any additional expense to me. I was also to have possession of the block on June 1.   *   *   * The deal was consummated. I should judge, along about the 1st of June, 1905.'' The plaintiff does not refer in his testimony at all to the second offer which Miller made the company, as shown above; but with respect to this first offer he further testified: ''When I had this agreement with Miller for the purchase of the Denver Block, part of the agreement was that I was to pay the taxes for that year. All the insurance that was then on the property I was to have. I was to have the premiums which had been paid by the company. I was to pay $5,000 cash, $1,000 each year for five years, and $20,000 in ten years. The security on these deferred payments was to be a mortgage on the building—on the property, to be executed by myself and wife. That was the understanding.''

Miller was called as a witness for the plaintiff and testified that he wrote the letter of inquiry of May 6 and submitted the offer of May 17 at the request of Schaeffer. He says: ''I was doing this thing for Schaeffer, charging him a commission for it.'' Taking the evidence offered for the plaintiff as a whole,

it is not susceptible of two constructions. The offer of May 17, which Miller submitted to the company, is not the offer which Schaeffer says he made; but whether it is or not is immaterial, for the company specifically rejected it in its letter of May 24. Whether Schaeffer ever authorized the offer of May 31 we are left entirely to conjecture, so far as plaintiff's testimony is concerned. Since the offer of May 17 was rejected by the company, there never was any contract entered into, unless it was upon the basis of the offer of May 31, which does not include any reference to unearned premiums of insurance or the right of Schaeffer to the rents after June 1. It is said in respondent's brief that, when the telegrams of June 1 and 6 were sent by the company to Miller, the proposition that Schaeffer should have the unearned insurance premiums had been by implication accepted by the company. The proposition that Schaeffer should have these unearned premiums is mentioned in only two communications. The first is in the offer of May 17, which the company refused, and in refusing the offer it refused to concede this proposition to Schaeffer. The matter is again mentioned in Miller's letter of June 5, in which he undertakes to state the terms of sale as understood by Schaeffer; and immediately upon receipt of this letter the company repudiated the alleged contract so far as it includes that proposition, and again refused this concession. So that it cannot be urged that the company ever by implication or otherwise agreed to this claim which Schaeffer appears to have considered of great consequence. According to Schaeffer's own testimony, he never agreed to the terms of the offer of May 31, and, accepting this as correct, then there never was a contract, for the minds of the parties never met. According to Schaeffer's testimony, the only offer he ever authorized included both unearned premiums and rents from June 1, and, as the company never agreed to either of these conditions, there could not have been a contract. In its letter of June 12 the company says: "If the sale is promptly closed, the rents from June 1 will be payable to the purchaser," but the sale was never promptly closed nor closed at all; and, since there was not any contract, there could not, as a matter of

course, be any rescission of a contract, and in these two respects, at least, the evidence fails to support the allegations of the complaint.

That Miller was a special agent for the company in the matter of this attempted sale appears beyond controversy, and that Schaeffer knew this is likewise apparent. He knew that Miller did not have authority generally to sell this property or to fix a price or the terms of sale, for he knew that Miller had to submit every proposition to the company. Furthermore, since they were dealing with real estate, Schaeffer knew, or, what amounts to the same thing, he was presumed to know, that Miller's authority had to be in writing. There is not any question of ratification involved here. "An agent for a particular act or transaction is called a special agent." (Revised Codes, sec. 5415.) A person dealing with a special agent is bound to ascertain the scope of the agent's authority, and, if he does not, he deals at his peril. (*Moore* v. *Skyles,* 33 Mont. 135, 114 Am. St. Rep. 801, 82 Pac. 799, 3 L. R. A., n. s., 136.) Miller testifies that he showed Schaeffer all of the correspondence passing between himself and the company. Schaeffer says he did not see any of it. He testifies: "[I] didn't ask Miller to let me see any of the correspondence of the company. I took his word for everything." To accept Schaeffer's version does not aid him in the least; for he knew that Miller was acting under delegated authority, and it has become a trite saying that "where one deals with another, acting under delegated authority, it is his own folly if he does not inform himself of the scope of the authority." (*Dozier* v. *Freeman,* 47 Miss. 647.) "There being a written authority, persons dealing with the party holding it are bound to inform themselves of its extent, and inquire into its limitations." (*Rawson* v. *Curtiss,* 19 Ill. 455.) Since Schaeffer was charged with knowledge that Miller's authority had to be in writing, he was bound to ascertain the terms and conditions of the letters and telegrams which conferred the authority, or deal at his peril if he failed to so inform himself. (*Miller* v. *Wehrman* (Neb.), 115 N. W. 1078.)

The rule with regard to special agents is well settled. "Their acts do not bind their principals unless they pursue their authority strictly, and those who deal with them are chargeable with notice of the extent of their authority." (*Milne* v. *Kleb,* 44 N. J. Eq. 378, 14 Atl. 646.)   If Schaeffer had examined the letters and telegrams from the company to Miller, he would have known just the extent of Miller's authority; and, if he did not do so, he has made himself the victim of his own folly.   Miller could sell upon the terms given in the telegrams of June 1 and 6, and upon no other terms.

This action, of course, proceeded upon the theory that the payment of $5,000 to Miller was payment to the company.   Section 5441, Revised Codes, provides: "A special agent to sell has authority to receive the price on delivery of the thing sold, but not afterward."   Miller never had authority to deliver possession of the property to the plaintiff.   The right of plaintiff to the possession would follow as a matter of course upon the completion of the sale; but the papers necessary to evidence the transaction were to be prepared and the interests of the company conserved, not by Miller, but by Mr. Gunn, the company's attorney.   Whether Miller undertook to give possession of the property to Schaeffer is not made plain from the testimony offered on behalf of the plaintiff.   He did, however, receive the $5,000 as part payment, and, assuming that he delivered possession of the property to Schaeffer, it is perfectly manifest that in each instance he exceeded his authority.

It is contended by respondent that Miller had authority to receive the $5,000 for the company, and that he did so receive it.   In his brief it is said: "An authority to make a contract for the sale of lands will authorize the agent to receive so much of the proceeds of the money as is to be paid in hand on the sale as an incident of the sale."   This is correct, but such authority does not authorize the agent to receive a part of the purchase price before any contract of sale is entered into, and neither does it authorize the agent to receive a portion of the purchase price upon a contract which the agent is not authorized to make.   From *Brown* v. *Grady,* 16 Wyo. 151,

92 Pac. 622, it appears that one Scott owned certain lands. He authorized Jones, his special agent, to sell upon certain stated terms. Jones undertook to sell to Brown upon different terms, and evidenced the agreement by a memorandum in writing and received $400 as a part of the purchase price. Scott afterward sold to Grady, who brought suit against Brown for possession and for damages. The supreme court says: "Brown was dealing with a special agent with limited authority, and he was bound to know the extent of the agent's authority. This principle is too well settled to require the citation of authorities; but see 1 Ency. of Law, 2d ed., p. 987. We think the agent clearly exceeded his authority in executing the instrument above set out; and this attempted sale, not having been ratified by Scott, was invalid, and he was not bound thereby. Counsel for defendant in error place some reliance upon the payment of the $400 by Brown to Jones. * * * But this money never was paid to or received by Scott, and Jones could not bind him by the receipt of money on a contract which he (Jones) had no authority to make." And to the same effect is *Jackson* v. *Badger,* 35 Minn. 52, 26 N. W. 908, where the supreme court of Minnesota said: "Although the $50 earnest-money, paid by the plaintiffs to the agents, has never been repaid, that does not charge the defendant with liability if he never authorized nor ratified the contract upon which it was paid, nor by receiving the money or otherwise placed himself in the position of having sanctioned the payment. The contract being without his authority, the receipt of the deposit money by the agent was unauthorized, and was not in legal effect a receipt by the defendant."

Since there was not any contract entered into, Miller did not have any authority to receive the $5,000, and its receipt by him was not the receipt of that amount of money by the company, and, this being so, it follows that the plaintiff cannot recover any portion of it from the company. There is not any question of ostensible authority involved here. The company did not do anything which would lead Schaeffer to believe that Miller had any authority other than that actually conferred by the letters and telegrams. Neither is there any question of rati-

fication involved, since it is apparent that, if Miller and Schaeffer ever agreed upon any terms, they were different from those authorized by the company, and, as soon as apprised of the terms as Schaeffer understood them, the company repudiated them in its letter of June 12.

We have disposed of this case upon the evidence offered on behalf of the plaintiff alone. The evidence offered by the company presents the question in quite a different aspect; but, since it does not aid the plaintiff at all, we deem it unnecessary to consider it or the other errors specified in appellant's brief.

The judgment and order are reversed, and the cause is remanded for a new trial or for other proceedings not inconsistent with the views herein expressed.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SMITH concur.